**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **Sheffield Metals Cleveland, LLC,** | **CASE NO. 1:17 CV 1120** |
| **Plaintiff,** | **JUDGE PATRICIA A. GAUGHAN** |
| vs. | |
| **Kimberly Kevwitch, et al.,** | **Memorandum of Opinion and Order** |
| **Defendant.** | |

**Introduction**

This matter is before the Court upon plaintiff's Motion for Partial Summary Judgment (Doc. 27) and defendant's Cross-Motion for Summary Judgment of No Release[1] (Doc. 32). This case arises out of the termination of defendant's employment with plaintiff. For the following reasons, plaintiff's motion is GRANTED and defendant's motion is DENIED.

**Facts**

Plaintiff Sheffield Metals Cleveland, LLC filed this Verified Complaint for

---

[1] After the Court-ordered deadline, defendant filed the cross-motion along with its brief in opposition to plaintiff's motion. Nevertheless, in that the arguments are the same, further briefing is not necessary. Furthermore, the temporary restraining order expires on November 30, 2017.

1

Temporary Restraining Order, Preliminary Injunction and Permanent Injunctive Relief and Other Causes of Action against defendant Kimberly Kevwitch.[2]

Briefly, the Complaint alleges that plaintiff hired defendant on March 4, 2013. As a condition of her employment, defendant was required to enter into an Employment Agreement. On September 9, 2016, plaintiff terminated defendant's employment. In consideration for a separation payment, defendant signed a Confidential Separation Agreement and General Release (hereafter, the Release). Plaintiff then filed its lawsuit against defendant for misappropriation of trade secrets and breach of contract. The parties entered into an agreed temporary restraining order through November 30, 2017.

Defendant asserts three Counterclaims [3] which are the subject of the herein motion: Public policy wrongful discharge (First), intentional infliction of emotional distress (Second), and declaratory judgment that no release exists as a result of duress (Third). At the August 14, 2017 status conference, this Court agreed to decide, via motion for summary judgment, whether defendant released her counterclaims in exchange for compensation. The Court set an expedited briefing schedule for plaintiff's motion for partial summary judgment. The Court thereafter granted an extension of the briefing schedule. The parties agreed to take defendant's deposition only on the matters relating to the Release.

The following relevant facts are before this Court. Defendant testified at deposition that on the date of her termination, September 9, she was called into the conference room and

---

[2] Drexel Metals, Inc. was also named as a defendant but was subsequently voluntarily dismissed.

[3] Defendant asserted a fourth Counterclaim which is not subject to the motion.

2

Joe LaCrue, her supervisor, handed her a document which was the Release and told her to "sign it if I wanted to get my last pay." LaCrue told her not to ask him anything about the document because "he didn't know what was on it and didn't understand it." Defendant "kind of" or "not really" looked at the paper. She could not remember whether she read the document but "I don't think I did" and she was "crying a lot." Defendant signed and dated the document. Defendant signed it because LaCrue told her to sign it if she wanted to get her last check. (deft. depo. 15-20, 63)

Defendant submits her declaration wherein she states that during the September 9 meeting, at which she was fired, Joe LaCrue presented her with a piece of paper and told her to sign it to receive her final pay. Defendant understood this to mean that she had to sign the paper to receive pay she had already earned during her employment. She was crying so hard that she was physically unable to read the paper. LaCrue told her that he did not know what the paper was, and not to ask him anything about it because he did not know anything about it. He refused to answer defendant's questions about the paper. (deft. decl.)

The one page Release states, in part:

1. [Plaintiff] will give me a separation payment of $7,700, less withholding for applicable taxes... I agree that I am not currently entitled to this money, and that [plaintiff] is only agreeing to pay it because of what I [ ] agreeing to in this Agreement.

\*\*\*

3. I release [plaintiff] ... from all claims of any kind that arose before I signed this Agreement, except for claims which cannot be released under applicable law....

\*\*\*

11. [Plaintiff] did not pressure me into signing this Agreement, nor did [plaintiff] promise me anything in exchange for signing this Agreement other than what is in

3

writing on this document.

(deft. depo.Ex. 1)

On September 12, 2016, defendant sent a letter, via email, to plaintiff's human resources department stating, in part:

> Re: My Refusal of the Severance Package at this time, on the Grounds of a 21 day legal period to review the severance letter document before signing it, and not receiving a copy of the severance letter document and I was not advised of any of my legal rights by Joe LaCrue, regarding the 21 day legal period of review before signing it.
>
> Hello I am writing in regards to refuse the severance check at this time, due to signing the paperwork under extreme emotional distress and shock and feeling as if I did not have any other option but to sign the severance letter document, and then I subsequently sought legal advice, which has made me aware of right to review this document and its contents, which I have still not received a copy of and have legally up to 21 days to review the document before signing it, I would like to have a copy forwarded to me via email... so that I may forward to my lawyer to review the document with me, and to determine and confirm that I will be eligible for all my unemployment insurance benefits that I am entitled to...

(deft. depo.Ex 2) The letter further states, "After I have the 21 day, legal allotted period of time to sufficiently review the severance document with my lawyer, we will advise on how we will proceed at this time. I do expect my final pay, commissions and vacation time payout." (*Id.*)

Defendant had not consulted a lawyer, but had consulted her aunt who is a human resources director. (deft. depo. 23-30)

Defendant was asked at deposition why she was under "extreme emotional distress" (as referenced in her letter) when she signed the Release. She responded,

A. I just lost my job.

Q. Any other reason?

4

> A. I was pretty upset.
>
> Q. Why were you upset?
>
> A. I lost my job.
>
> Q. Did anyone make you sign the paperwork?
>
> A. Yeah.
>
> Q. Who made you sign it?
>
> A. Joe.
>
> Q. How did he make you sign it?
>
> A. He said I have to sign it if I want to get my final pay.
>
> Q. Was there anything else he did to make you sign the paperwork?
>
> A. No.
>
> Q. Any other reason why you were under extreme emotional distress that day when you signed the paperwork?
>
> A. No.

(deft. depo. 34-35) When asked by her lawyer on cross-examination "what else was going on at the time [she] signed the release that put [her] under the feeling of duress," defendant responded:

> I had overheard a speaker phone conversation with my co-worker, and it was – Joe was talking horridly about me, and was saying a lot of untrue things, which scared me, because I didn't know he had any feelings of being upset with me about anything. And I was just terrified, because I thought what is going on? Like, I thought you were somebody I could trust, and I'm hearing all this horrible stuff about myself. So I contacted HR, because I didn't know what else to do. And I was just terrified of losing my job. Like, I hadn't done anything. So I was just scared to death. So, like, that whole last couple of months, I just had to work with him, and it was never resolved. It was never dealt with. Ever. I mean, she said it was going to be dealt with. It never was. So I just had to awkwardly work with somebody who knew I made a complaint about them, all the time wondering what's going to happen. And it was just – there

was a lot going on with that.

(*Id.* 77-78) Defendant testified that the speaker phone conversation had taken place on July 21, 2016. (*Id.* 79)

According to defendant's declaration, on July 21, 2016, she overheard a speaker phone conversation between her supervisor, Joe LaCrue, and a co-worker. During the conversation, LaCrue asked the co-worker whether defendant was at work and whether she had made up time missed for a doctor's appointment. The co-worker responded that defendant was at work and had more than made up her time. LaCrue stated that defendant never made up her time, and always acted like a "fucking bitch" when asked to make up time. LaCrue asked the co-worker whether defendant had been acting like a bitch lately, and the co-worker responded that he had never seen defendant act like that and that she was always at work. After the speaker phone conversation ended, defendant's co-worker told her that LaCrue had asked him to keep written tabs on defendant. He refused. Defendant spent the rest of the day crying in her office. The next day, another co-worker told defendant that LaCrue had also asked him to keep tabs on defendant because she was a terrible employee who did not follow the rules, abused the fact that LaCrue was never there, and had a terrible attitude with co-workers and customers. This co-worker did keep a notebook but then stopped after a few weeks when he found that defendant arrived early for work, worked through lunch, and stayed late. The co-worker told defendant that he thought LaCrue asked him to spy on defendant because she is female. Defendant reported all these facts on July 23 to Sue Barstow, Director of Human Resources. Barstow told defendant she would investigate. Barstow then told defendant that she had investigated the complaint, all witnesses

6

corroborated defendant's account, and there would be a meeting with all parties involved, but nothing happened. Finally, defendant states that "Sheffield also informed me that they had told Joe LaCrue about my complaint, so he was fully aware of the complaint and witness interviews, which made everyday terrifying for me to go to work with him." (deft. decl.)

On September 13, 2016, the day after defendant sent the September 12 letter to human resources, and pursuant to her request, plaintiff sent defendant a copy of the signed Release via email. Defendant received the Release. (deft. depo. 40-41; Ex. 3) When defendant showed the Release to her aunt, she was told that it was a severance agreement. (*Id.* 43-44)

According to Michelle Caldwell, who is responsible for the payroll and benefits provided to plaintiff's employees, she prepared four checks for defendant on September 12, 2016. The checks represented defendant's last regular payroll, last commission, remaining vacation, and payment pursuant to a release agreement she signed. Caldwell sent the four checks to defendant via UPS overnight mail. Caldwell received a confirmation notice from UPS which stated that the four checks were received on September 13, 2016, and accepted by an individual named Kim. (Michelle Caldwell aff.)

Defendant testified at deposition that she received four checks from plaintiff on September 13, 2016. She acknowledged that three of the checks were her regular pay, commission pay, and unused vacation pay. She was asked, "Did you also receive a paycheck for your separation pay in accordance with the release agreement?" She responded, "I think so." That same day, defendant deposited the checks for regular pay, commission pay, and unused vacation pay. When asked whether she "also at that time deposit[ed] the paycheck or the check reflecting your separation pay," she responded, "No." (deft. depo. 46-48: Exs. 4-7 )

7

Although not sure of the date, defendant later deposited the fourth check. (*Id.* 54) Copies of the checks with defendant's endorsements are submitted. The four checks are dated September 12, 2016. (deft. depo. Exs 4-7) In her responses to requests for admissions, defendant admitted that she received four checks from plaintiff on September 13, 2016; that one check she received was for separation pay; that she received a check in the amount of $7,700 minus applicable withholdings in accordance with the Release; that she received a check from plaintiff in the net amount of $4,828.25; that she negotiated, deposited, or cashed the separation pay check she received in the net amount of $4,828.25; and that she has not returned the money identified in the latter. (Doc. 27 Ex. A Nos. 13, 20, 22, 26, 33)

According to Kathleen Fay, who is responsible for plaintiff's financial and accounting services, plaintiff prepared the four checks on September 12, 2016: the last regular payroll check, last commission paycheck, payment for remaining vacation, and payment pursuant to the Release. Defendant deposited the three checks for her last regular payroll, last commission, and vacation on September 13, 2016. The check related to defendant's Release was cashed or deposited on October 12, 2016. (Kathleen Fay aff.) Defendant has not offered to return any money to plaintiff. (deft. depo. 67-68)

According to defendant's declaration, she received the four checks but "I did not understand any of these checks to contain a severance payment. Instead, I understood them all to be pay I had earned prior to my termination at Sheffield." (deft. decl. ¶ 17) She further states, "I am willing and able to return $4,828.95, the amount of money I now understand Sheffield claims is severance pay, to Sheffield if required by the Court to do so." (*Id.* ¶ 18) Defendant also points to her deposition testimony wherein she testified that the fourth check

was "just all the pay." This meant, "All of my final pay." (deft. depo. 55)

This matter is now before the Court upon plaintiff's Partial Motion for Summary Judgment and defendant's Cross-Motion for Summary Judgment of No Release.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### Discussion

Plaintiff argues that it is entitled to judgment on the three counterclaims for several reasons.

**(a) Whether defendant can void the Release given that she accepted monetary consideration which has not been tendered back**

Plaintiff points to *Weisman v. Blaushild,* 2008 WL 192139 (Ohio App. 8th Dist. Jan. 24, 2008), which addresses the applicable Ohio law:

> Generally speaking, validly executed releases are enforceable. 'A release of a cause of action is ordinarily an absolute bar to a later action on any claim encompassed within the release.' [quoting *Haller v. Borrer Corp.,* 50 Ohio St.3d 10 (1990)] ***"A release ordinarily operates to extinguish a right in exchange for some consideration and effectively operates as an estoppel or a defense to an action by the releasor. *Task v. National City Bank,* 1994 WL 43883 (Ohio App. 8th Dist. Feb. 10, 1994) *** To avoid the release, the releasor must allege that the release was obtained by fraud and that he has tendered back the consideration received for the release. *Haller, supra*. In *Haller*, the Ohio Supreme Court went to great lengths to distinguish "fraud in the factum" (which would make the release 'void' and the tender-back rule would not apply) and 'fraud in the inducement' (which would make the release 'voidable' and the tender-back rule would apply). *** The policy behind the tender-back rule when the parties agree to a release provision is that the law favors the prevention of litigation by

10

> the compromise and settlement of controversies. *Haller* . Therefore, 'a releasor ought not be allowed to retain the benefit of his act of compromise and at the same time attack its validity when he understood the nature and consequence of his act, regardless of the basic nature of the inducement employed.' *Id.*, citing *Shallenberger v. Motorists Mut. Ins. Co.*, 167 Ohio St. 494 (1958). 'In that event, the consideration should first be returned so that the parties may be placed in the positions they enjoyed prior to the practice of the fraud alleged.' *Id.*

The Sixth Circuit, applying Ohio law, has made clear that consideration must be tendered back prior to bringing claims challenging the release:

> Under Ohio law, a releasor may not attack the validity of a release for fraud in the inducement *unless he first tenders back the consideration* he received for making the release. *** Tender, in this context, refers to an offer, not a completed transaction. *** The tender must be made before the rescinding party files the lawsuit. ***
>
> It is well-settled that under Ohio law [the releasor] ha[s] to *first* tender back the consideration- *before* he could bring his suit. *** Ohio courts have recognized that with respect to the tender-back rule, timing is critical.

*Talmer Bank and Trust v. Malek,* 651 Fed.Appx. 438 (6th Cir. 2016) (internal quotation marks and citations omitted) (emphasis in original).

Plaintiff maintains that challenges to a contract alleging duress are challenges based on fraud in the inducement, not fraud in the factum. *Kight v. Miller,* - N.E.3d-, 2017 WL 2839663 (Ohio App. 7th Dist. June 14, 2017) (citations omitted) ("This is different from a case of fraud in the inducement, where the party to be charged admits she signed the instrument and received consideration therefor but asserts she was induced to do so by the other party's fraud or misrepresentation. Some examples are when: a party signs a release based on a misrepresentation of the extent of her injuries; a party signs a document after the value of the consideration was misrepresented; or a party signs under duress or coercion.")

Plaintiff refers to the facts, stated above, wherein it is demonstrated that defendant signed and dated the Release on September 9, 2016 and did not receive a copy; she sent a

11

letter on September 12, 2016 "refus[ing] the severance package at this time" and "refus[ing] the severance check at this time;" defendant received a copy of the Release on September 13, 2016; defendant received the separation paycheck (along with the other three checks) on September 13, 2016; defendant deposited three of the four checks on September 13, 2016; on October 12, 2016, defendant deposited the severance paycheck. Additionally, defendant admitted that she retained the consideration and had not returned it to plaintiff. Because she has not tendered back the consideration, she cannot challenge, or elect to void, the Release and all three counterclaims fail as a matter of law.

Defendant argues that the Release is void due to fraud in the factum. As such, she need not have tendered back the consideration obtained as part of the Release.

The Ohio Supreme Court has addressed the difference between fraud in the factum (wherein the Release would be void *ab initio* ) and fraud in the inducement (wherein the Release is only voidable). In *Haller v. Borrer Corp.,* 50 Ohio St.3d 10 (1990), the court stated, "A release is obtained by fraud in the factum where an intentional act or misrepresentation of one party precludes a meeting of the minds concerning the nature or character of the purported agreement." Additionally,

> [W]here there is a mere misrepresentation by one party of the contents of a release, the agreement is not void for fraud in the factum when the releasor has an opportunity to read and understand the document before execution. A person of ordinary mind cannot say that he was misled into singing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed. If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs.

*Id.* (citations and internal quotations omitted).

Fraud in the inducement, on the other hand, occurs where "the plaintiff, while

12

admitting that he released his claim for damages and received a consideration therefor, asserts that he was induced to do so by the defendant's fraud or misrepresentation. The fraud relates not to the nature or purport of the release, but to the facts inducing its execution..." Thus, "the releasor claims that he was induced to grant the release upon the wrongful conduct or misrepresentation of the person so benefitted. " The "wrongful conduct may include even coercion and duress." Finally, "So long as the releasor understands the nature and character of his act of release and that the releasee will no longer be liable on the claims concerned, or has an opportunity to do so, the fraud is in the inducement only and does not constitute a basis to find the agreement void." *Id.*

Defendant asserts fraud in the factum based on the following:

First, plaintiff misrepresented the contents and import of the Severance Agreement. Defendant points to her deposition testimony where she stated that Joe LaCrue called her into the conference room, fired her, and told her to sign the document he gave her in order to receive her "last pay." Defendant contends in her brief that she "understood the paper she was signing to be an administrative document necessary to receive her final pay from work she had already performed for Sheffield (and was therefore already entitled to), not a new agreement between [defendant] and [plaintiff] releasing her employment discrimination claims." (Doc. 32 at 7) She points to her declaration wherein she states that she understood LaCrue's statement regarding signing to receive her final pay to mean pay she had already earned. And, "I signed the Document because I thought I had to sign the Document to receive pay I had already earned during my employment with Sheffield."(deft. decl. ¶¶ 13, 16) She also points to her deposition testimony wherein she testified that "I didn't know I was signing

13

an agreement." (deft. depo. 58) Therefore, defendant argues that plaintiff fraudulently procured defendant's signature by presenting a Severance Agreement, misrepresenting it as an administrative document to receive pay already earned.

Second, plaintiff insisted that defendant immediately sign the Severance Agreement. Defendant testified at deposition that "I don't think" [I read the document on September 9] and "I was just crying a lot..." (deft. depo. 63). She stated in her declaration, "I was crying so hard when Mr. LaCrue presented me the Document that I was not physically able to read the Document." (deft. decl. ¶ 14)

Third, plaintiff refused to answer defendant's questions regarding the Severance Agreement. In particular, defendant testified at deposition that LaCrue refused to answer any questions about the document. She stated in her declaration "Mr. LaCrue told me he did not know what the Document was, told me to not ask him anything about what was on the paper because he did not know shit about it, and then refused to answer my questions about the Document." (deft. decl. ¶ 15)

Fourth, plaintiff did not provide defendant a copy of the Severance Agreement until after she requested a copy.

The Court agrees with plaintiff that defendant's allegations of duress constitute fraud in the inducement.[4] Fraud in the factum occurs where a party signs the agreement thinking that the document being signed is something different. *Pheils v. Palmer,* 1993 WL 419042 (Ohio App. 6th Dist. 1993). Where the party attempting to avoid the release "alleges

---

[4] "Whether the fraud as alleged is in the factum or in the inducement is an issue of law for the court. *Haller,* 50 Ohio St.3d at 14-15.

14

misrepresentation on the part of Defendants, [and] he has not alleged that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed," he has alleged a case of fraud in the inducement, not in the factum. *Larkins v. Regional Elite Airline Services, LLC,* 2013 WL 1818528 (S.D.Ohio April 29, 2013 (quoting *Dice v. Akron, Canton & Youngstown RR. Co.*, 155 Ohio St. 185 (1951)). "The fraud relates not to the nature or purport of the release, but to the facts inducing its execution." *Id.* (quoting *Haller, supra*).

Here, defendant was not misled regarding the contents of the Release. In fact, she testified that LaCrue would not answer any questions about the Release. She does not allege that LaCrue substituted a different document for the one that she intended to sign. The facts do not support defendant's argument that she believed she was signing an administrative document necessary to receive her final pay. The facts show that she signed the Release on September 9, 2016, and was not provided a copy. On September 12, she wrote to receive a copy of "the severance letter document" and to refuse the "severance package at this time" and "refuse the severance check at this time." She make no reference in her letter that she was misled into believing that the document she signed on September 9 was an agreement for her final pay. Rather, the letter shows that she understood that she signed a severance agreement.

Contrary to her assertion that LaCrue misrepresented the document as an administrative document to receive her final pay, defendant testified that LaCrue refused to answer any questions and told her that he did not know what was on the paper. Additionally, while her declaration states that she understood "final pay" to mean pay she had already

15

earned, she testified at deposition that she did not know what LaCrue meant by "final pay":

> Q. Now, you mentioned that during the meeting Joe made a statement that if you wanted to get paid, you had to sign it?
> A. Yes.
> Q. What pay was he referring to; do you know?
> A. I assume my regular pay, to get my last check.
> Q. Did he say "regular pay"?
> A. My last check, I think.
> Q. He said your last check. Was he referring, in your mind, to your commission check?
> A. I don't know.
> Q. Your vacation check?
> A. I don't know.
> Q. In your mind was he referring to your regular paycheck?
> A. I don't know.
> Q. He just said to get your last check?
> A. Yes.

(deft. depo. 19-20). Thus, the Court agrees with plaintiff that defendant cannot support her claim that LaCrue was referring to her final, regular paycheck or that he affirmatively misled her. Rather, he said he did not know what was on the paper and she did not know what was meant by final pay.

Moreover, as discussed above, the agreement is not void for fraud in the factum when the releasor has an opportunity to read and understand the document before she signs it. "A person of ordinary mind cannot say that he was misled into singing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed. If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs. " *Haller, supra.* Likewise, "[I]t will not do for a man to enter into a contract, and when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *W.K. v. Farrell,* 167 Ohio App.3d (2006) (quoting *ABM Farms, Inc. v. Woods*, 81

16

Ohio St.3d 498 (1998)). "If this practice were permitted, contracts would not be worth the paper on which they are written." *Id.* Defendant could have read the Release, but testified,

    Q. Did you look at it?

    A. Kind of.

(deft. depo. 17) She testified that she could not remember whether she read the document but "I don't think I did." She points out that she also testified that she was "crying a lot," and stated in her declaration that she was crying so hard she was not able to physically read the document. However, there is no evidence that defendant was prevented by plaintiff from reading the document.

    Defendant argues that even if the Court decides that she has alleged fraud in the inducement, she has tendered back the severance payment as required. Defendant asserts that by way of her September 12 letter, she refused the severance check and severance package. Thus, she offered to return the severance check. Nonetheless, plaintiff still sent defendant four checks, one of which plaintiff contends was the severance payment. However, none of the checks were labeled to show what pay was covered. There is no evidence that defendant knew that the fourth check was for severance pay. Plaintiff's actions in sending the alleged severance payment to defendant after she refused the check, and without labeling it as a severance payment, is evidence that plaintiff tried to trick defendant into entering into the severance agreement despite her refusal to do so.

    The Court finds defendant's argument to be unpersuasive. As discussed in the facts above, defendant retained the consideration and did not return it. She claims she tendered back the consideration by way of her September 12 letter. However, she did not receive the

severance check until September 13 and deposited it on October 12. She claims that she did not know that the fourth check was for severance pay. But, her admissions responses are that she received four checks and one was for severance pay in accordance with the Release. She deposited all four checks. The Court agrees with plaintiff that it is irrelevant whether she knew which of the four was for her severance when she knew that one was such a payment. Additionally, her letter belies her assertion that she did not know the fourth check was for severance given that she delayed cashing that check for a month. She claims that none of the checks were labeled. However, her September 12 letter identified four checks: her "severance check" which she was "refusing at this time," and her "final pay, commissions, and vacation time payout." This shows that she was expecting four checks. Yet, she asserts that on September 13, when she received four checks, she was unaware of what they represented because they were not labeled. Even assuming that to be true, she ultimately deposited all four. This would include the severance check.

**(b) Whether defendant ratified the Release by depositing the consideration**

Plaintiff contends that defendant ratified the Release when she cashed the separation check a month after she received it. As discussed above, defendant allegedly signed the Release under duress on September 9. She then consulted her aunt who told her the Release was a severance agreement. She deposited the three checks she referenced in her September 12 letter. A month later, she deposited the fourth check which she had also referenced in the letter. Defendant asserts she had been under duress because if she did not sign the document, she would not get her final pay. She also testified that she was under duress because she had overheard the speaker phone conversation and was terrified of losing her job, and it was

18

awkward working with LaCrue against whom she had made the complaint. However, by September 13, she had received her "last pay," and by that date (and certainly by October 12) the other circumstances contributing to duress had ceased.

The parties agree that "[d]uress which might otherwise constitute grounds for challenging the validity of an instrument may be removed and the purpose of the instrument effectuated through ratification if the maker, at a time when he is capable of acting freely, approves or adopts the instrument." *MacNealy v. MacNealy*, 1997 WL 674622 (Ohio App. 2d Dist. Oct. 31, 1997) "[T]he power of a party to avoid a contract for duress is lost if, after the circumstances that made the contract voidable have ceased to exist, he manifests to the other party his intention to affirm it." *Id.*

Defendant maintains that plaintiff has not shown ratification because there was no intent to affirm the agreement where she did not know the fourth check was the alleged severance payment and, in fact, plaintiff tricked her into cashing the check by disguising it as pay she had earned outside the severance agreement. This argument fails for the same reasons discussed above. Moreover, her action in waiting a month to deposit the severance check was consistent with her September 12 letter stating that she was refusing it at that time until she could consider the "severance letter document."

The Court finds that defendant ratified the Release by depositing the consideration.

**(c) Whether defendant can show she executed the Release under duress**

Plaintiff argues that even if defendant tendered back the money, she cannot establish the elements of legal duress. "To avoid a contract on the basis of duress, a party must prove coercion by the other party to the contract. It is not enough to show that one assented merely

19

because of difficult circumstances that are not the fault of the other party." *Blodgett v. Blodgett,* 49 Ohio St.3d 243 (1990).

The Court agrees with plaintiff that the evidence only shows that defendant was presented with the Release, was given an opportunity to read it, and voluntarily signed and dated it. While she asserts that she had no alternative to sign the Release in order to receive her last check, her deposition testimony shows that she did not know what was meant by her last check. Nor can she show that defendant caused the coercive acts as defendant testified at deposition that LaCrue knew nothing about the document and did not answer questions.

For these reasons, plaintiff's Partial Motion for Summary Judgment is granted and the First, Second, and Third Counterclaims are dismissed. Defendant's Cross-Motion for Summary Judgment of No Release is denied.

IT IS SO ORDERED.

                                        /s/ Patricia A. Gaughan
                                        PATRICIA A. GAUGHAN
                                        United States District Court
                                        Chief Judge

Dated: 11/13/17