**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Sheffield Metals Cleveland, LLC.** | ) | **CASE NO. 1:17 CV 1120** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Kimberly Kevwitch, et al.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendant.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 47) and plaintiff's Motion for Summary Judgment on All Claims (Doc. 48)[1]. This case arises out of the termination of defendant's employment with plaintiff. For the following reasons, both motions are GRANTED in PART and DENIED in PART.

<u>**Facts**</u>

Plaintiff Sheffield Metals Cleveland, LLC filed this Verified Complaint for Temporary Restraining Order, Preliminary Injunction and Permanent Injunctive Relief and Other Causes of

---

[1]    The briefs and many exhibits have been filed under seal.

Action against defendant Kimberly Kevwitch[2] asserting three claims: misappropriation of trade secrets (Counts One and Four) and breach of contract (Count Two). Defendant asserted counterclaims, one of which remains pending.

Plaintiff is in the business of distributing coated and bare metal products and Engineered Standing Seam Metal Roof Systems. (Adam Mazzella decl.) According to Susan Barstow, plaintiff's Human Resources Coordinator, plaintiff offered employment to defendant on February 21, 2013. At that time, plaintiff notified defendant that she had to enter into a Nondisclosure and Noncompetition Agreement (NDNC Agreement) as part of her employment. Defendant was hired on March 4, 2013 as an Architectural Specialist and began performing a sales role shortly thereafter. Defendant was based out of plaintiff's Denver, Colorado office. As part of her hiring process, defendant was required to sign the NDNC Agreement with plaintiff. She signed the agreement on March 4, 2013. Per plaintiff's policy, three copies were signed- one for the defendant and two for plaintiff to maintain. Plaintiff paid defendant $100.00 for signing the NDNC Agreement and in exchange for the promises therein. (Barstow decl.; Doc. 48 Ex. 10)

Defendant acknowledged at deposition and in her responses to request for admissions that she entered into the agreement on that date. (Doc. 49 Ex. J; Ex. H) The NDNC states, *inter alia,* that defendant agreed to "never use or disclose any Trade Secrets except as necessary to perform my official duties...," and "return immediately... things that contain any Trade Secrets..." when her employment ended. The agreement also states that "during the first year

---

[2]    The Complaint also asserted a claim against Drexel Metals, Inc. (Count Three). But, Drexel was subsequently voluntarily dismissed as discussed below.

after my employment.. ends... I agree not to... work for... a business that is engaged to any extent in the business of selling, ... metal roofs, roof panels and equipment, and/or related services...” During that year, defendant additionally “agree[d] not to solicit or accept any business from a current or prospective client or vendor of” plaintiff “with whom I had any communication during the 3 years immediately preceding the end of my employment...”   Finally, during that year, defendant “agree[d] not to disparage the Company... or any of their ... employees.”  (Doc. 48 Ex. 10)

According to Adam Mazzella, plaintiff’s Vice President and one of defendant’s direct supervisors,

(a) In her roles, Kevwitch was responsible for working with architects to get Sheffield Metals’ products specified on projects... was responsible for inside sales and communicated with customers concerning sales and imputed sales orders into Sheffield Metals’ computer system.

(b) Through her positions, Kevwitch had extensive access to highly valuable, confidential, and proprietary information of the company.  In particular, she had access to information about business, operations, agreements, clients and client lists, vendors and vendor lists, bids, clients, vendors, pricing, profitability, marketing, accounts, books and records, data, business plans, manuals, reports, sales, know-how, techniques for sales (marketing and otherwise), products, products and bids under development, marketing programs and strategies, program cost information, methods, devices, use of equipment, processes, procedures, formulas, and pricing.

(c) All of this information is confidential and proprietary, is not publicly known,... has been generated ... over many years, and .. gives [plaintiff] a substantial competitive advantage...

(d) This information also derives independent economic value from not being generally known to... persons unaffiliated with [plaintiff].

(e) ... [plaintiff] takes numerous steps to protect [this information] from  public disclosure.. includ[ing] requiring passwords to access computer systems; not allowing non-employees unsupervised access to non-public areas of [plaintiff’s] offices; monitoring employee telephone and computer usage; and requiring employees... to sign written agreements that restrict their ability to use or disclose that information.

(Mazzella decl.)

On September 9, 2016, plaintiff terminated defendant's employment. (deft.depo. II at 68-69) On that date, she signed a Confidential Separation Agreement and General Release (the Release) wherein she agreed, among other things, to return all of plaintiff's property, to "continue to keep all of [plaintiff's] trade secrets confidential," and that "any previous agreements concerning non-competition, non-solicitation, confidentiality, trade secrets or intellectual property will each remain in full force and effect..." (deft. depo. I Ex. 1)

On October 28, 2016, defendant filed a Charge of Discrimination against plaintiff with the Colorado Civil Rights Division and the EEOC alleging that she was sexually harassed on July 21, 2016 and before and after, and was terminated because of her sex and in retaliation for engaging in protected activity. (Dco. 47 Ex. C)

In February 2017, defendant became employed by Drexel Metals, located in Denver, after having received an offer letter on January 12, 2017. The letter notified defendant that her employment would be at-will and that "you are stating that you are not bound by any non-compete agreements or other restrictive covenants with your previous employer. We also require and expect that your previous employer's confidential and proprietary information not be disclosed." (deft. depo. II; depo. Ex. 22) Defendant testified that she did not inform Drexel of her NDNC Agreement. (deft. depo. II at 71) She testified, as discussed below, that she did not learn that she had the NDNC Agreement until plaintiff filed this lawsuit.

According to Mazzella, Drexel is plaintiff's direct competitor. Both entities operate in the same territory, engage in the same business, and have similar customers. Websites of both show that each sells coil metal and sheet metal for metal roofing. Both sell standing seam metal

roofing, roofing fasteners, roofing sealants, roofing underlayments, and pipe boots. They "market and sell their products to the same customers who are roofing contractors, regional system and component manufacturers." (Mazzella decl.)

Mazzella and Joe LaCrue (plaintiff's Western Region General Manager in Denver) state that they learned that defendant called plaintiff's customers, identified herself as Drexel's employee, and sought to meet with them. She offered pricing and specific percentages below the established rates plaintiff had with those customers. In February and March 2017, plaintiff was contacted by some its customers informing plaintiff that defendant was soliciting the customers's business on behalf of Drexel and offering lower prices. They learned that she contacted Division 7 Sheet Metal, United Materials, The Roofing Company, Architectural Panels, Z-Craft, Craft Corp., Epic Steel, Premium Panels, American Wall Systems, and Western Architectural Metals. (Mazzell decl., LaCrue. decl.) For example, on February 20, 2017, defendant emailed Sam Webb of District 7:

> Hey Samsonite! Here is the pricing for you! I also have attached a credit application as well! I just sent you a marketing package via UPS, so that should be to you by wed or thurs this week! I will follow up this email with an electronic marketing package, so if you need to send out certain information to customers, gc's, etc., you have it available to you in electronic format as well! Thanks for reaching out to me today and hope to talk to you guys soon! Kim

(deft. depo. Ex. 28)

According to Mazzella, plaintiff then hired a specialist to conduct a forensic analysis of defendant's work laptop and learned that she sent company information to herself from her work email to her personal email. Some attachments contained confidential and proprietary information. She also copied information from her work laptop onto a USB drive. (Mazzella decl.) Mazzella submits defendant deposition Exhibits 13-20, which are emails with attachments

sent from defendant's work email to her personal email between March 13, 2015 and April 22, 2016.  (Doc. 48) Mazzella states that the attachments to Exhibits 13 and 14 reflect marketing and strategic planning information and that some of the information was emailed after work on the matter was complete. The attachments to Exhibits 15-20 are side-by-side comparisons which reflect research conducted by plaintiff and a comparison of plaintiff's products to those of its competitors.  The documents were from work completed over a year before defendant emailed them to herself. (Mazzella decl.)

Defendant admitted at deposition that she communicated with customers of plaintiff while she was employed with Drexel for purposes of selling them Drexel products. (deft. depo. II at 80-81)

When asked at deposition whether Drexel was a competitor of plaintiff, defendant responded, "I wouldn't say so."  When asked why, she responded, "Because they manufacture product.  And they've been in it- - they've been in the engineered roofing program for way longer than Sheffield.  So I wouldn't really say that's a fair competitor."  Defendant acknowledged at deposition that both companies sell metal sheet and coil, but that Drexel manufactures the roofing panel and trim while plaintiff does not.  (deft. depo. II at 77-80).

Plaintiff's counsel sent defendant a letter on February 24, 2017, stating that it learned of her recent employment with Drexel, a competitor of plaintiff, and reminding her of her continuing obligation to refrain from using or disclosing plaintiff's trade secrets and confidential information.  Defendant was informed of the results of the forensic analysis. She was reminded of her contractual obligations under the Separation Agreement and the NDNC Agreement. Plaintiff sent a second letter to defendant, dated  March 14, 2017, regarding her use of the

confidential information. (deft. depo. II Exs. 29, 30) Defendant did not respond to either letter. (deft. depo. II at 107-109)

When asked at deposition whether during her employment with plaintiff she emailed herself "company information" from her work account, defendant responded that she did. When asked why, defendant responded: "When I was employed at Sheffield I did not have a work laptop. And I would have to get stuff done for managers or whatever. And we were pretty busy. And I would probably just send it home to work on it, to get it done for the following day." (*Id.* at 26-27) When asked at deposition about the attachments that she emailed to herself, defendant testified that she created the documents and the information contained therein was obtained from the internet or other publicly-available sources. (*Id.* 28-48) She testified that, as part of her employment with plaintiff, she downloaded documents onto USB drives. She never took any of these flash drives home. (deft. depo. II at 28)

According to defendant's deposition testimony, she did not obtain any commission payments for new business while she was employed by Drexel. She testified elsewhere that she was not sure if she received commission payments for certain businesses. (deft. depo. II at 88-89, 93-95, 100) [3]

On May 30, 2017, plaintiff filed this Complaint which alleges claims for

---

[3]     Defendant also asserts that her deposition testimony shows that during her employment with Drexel, she never developed new accounts and only entered orders from pre-existing Drexel clients. Plaintiff counters that her deposition testimony also shows that she actually could not remember which of plaintiff's customers had pre-existing accounts with Drexel. (See Doc. 47, Doc. 55) However, neither position is clear from the deposition excerpts submitted to this Court. Unfortunately, neither party has filed the complete second deposition of defendant.

misappropriation of trade secrets and breach of contract against Kevwitch. Drexel was named as a defendant. Kevwitch filed four counterclaims. By prior Memorandum of Opinion and Order, this Court dismissed the first three. The fourth counterclaim, tortious interference with contract and business relationship, remains pending.

Defendant testified at deposition that she only learned that she "signed a noncompete" with plaintiff when the lawsuit was filed and "[s]o I just went home that day as soon as we found out" about "the noncompete." She further testified that when she learned she had "the noncompete agreement" with plaintiff, she intended on honoring it and left Drexel immediately. (deft. depo. II at 121-122)[4] On June 2, 2017, plaintiff and Kevwitch entered into the Agreed Temporary Restraining Order agreeing to the following:

> 1. Defendant Kevwitch is prohibited from soliciting, or encouraging any current customer to terminate their relationship with Plaintiff;
>
> 2. Defendant Kevwitch is prohibited from using or disclosing any of Plaintiff's trade secrets or confidential information;
>
> 3. Defendant Kevwitch is prohibited from engaging in any other conduct that would otherwise violate the Kevwitch Agreement or Kevwitch Release as those terms are defined in the Complaint.

(Doc. 10). Plaintiff and Drexel entered into a Settlement and Release Agreement on June 12, 2017. (Susan Barstow decl.; Ex. G) In that agreement, Drexel agreed, among other things, to terminate defendant's employment and not to re-hire her. Plaintiff agreed to dismiss Drexel from the lawsuit. (Doc. 60 Ex. C) By letter of June 13, 2017, Drexel terminated defendant's employment. The letter states in part, "The revelation of your previously undisclosed

---

[4]    This testimony is highly speculative given that the two letters plaintiff's counsel wrote defendant in February and March 2017 referred to the NDNC Agreement and the first letter attached a copy of the agreement. (Doc. 55 Exs. 14 and 15)

non-compete, and the ramifications that have accompanied this discovery have made this an unfortunate but necessary as [sic] part of the legal agreement between Drexel Metals and Sheffield Metals." (Ex. 31) Plaintiff voluntarily dismissed Drexel from the lawsuit on June 19, 2017.

According to defendant's declaration, she began working for Modern Materials as an Account Manager in August 2017. Modern Materials is not in the same industry as plaintiff. (deft. decl.)

In December 2017, plaintiff learned that defendant began working for Metal Sales, another competitor of plaintiff in the metal roofing business. Plaintiff learned that she then contacted plaintiff's customers to solicit them for sale of Metal Sales products. (Mazzella decl., LaCrue decl.)

This matter is now before the Court upon the cross motions for summary judgment.

## **Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution

will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**1. Misappropriation of Trade Secrets (Counts One and Four)**

Counts One and Four allege misappropriation of trade secrets under federal and state law. The parties acknowledge that Ohio and federal law define misappropriation and trade secret in a substantially similar way. "Misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

> (a) Used improper means to acquire knowledge of the trade secret;

> (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

> (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B) A trade secret means

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* (citing Ohio Rev. Code § 1333.61(D)).

Thus, to prevail on a claim, a plaintiff must establish: 1) the existence of a trade secret, 2)

the acquisition of that trade secret, and 3) the unauthorized use of that trade secret. *AK Steel*

*Corp. v. Pittsburgh Logistics Systems, Inc.,* 2017 WL 194349 (S.D.Ohio January 18,

2017)(citations omitted).

Plaintiff argues that summary judgment is warranted on this claim because the evidence shows that defendant sent the work related emails to her personal email account with attachments which included confidential and trade secret information including notes from company strategy meetings and product comparison sheets. Plaintiff relies on the declaration testimony of Mazzella (¶ 10) and the work related emails that defendant sent to her personal email account. (Exs. 13-20) When plaintiff asked her to return or destroy the information and confirm she had done so, defendant did not respond to the letters.

Defendant argues that the misappropriation of trade secrets claim fails for the following reasons. Plaintiff cannot demonstrate that it has any protectable trade secrets. Defendant asserts that the information contained in the attachments to the emails was in the public domain and, therefore, not secret. Plaintiff additionally fails to show that the information contained in the documents has any independent economic value. Nor did plaintiff take reasonable steps to maintain the purported secrecy. Defendant also argues that she did not misappropriate the purported trade secrets.

Defendant points to the following portions of her deposition testimony to show that the information contained in the email attachments was all publicly available. Defendant was questioned about the eight emails, containing attachments, she sent from her work email to her personal email. (deft. depo. II Exs. 13-20) As to the first email with attachment, defendant discussed a four page memorandum she created regarding her "ideas of how to proceed with the architectural program." When asked how she compiled the document, defendant testified, "Research. All of that stuff is online, so you just get on there and grab it." (deft.depo. II 28-33)

As to the second email with attachment, defendant discussed a memorandum she created regarding "Getting Sheffield specified." She testified that she "went to the competitors' web sites" to get the information that she included in the memorandum. She did not believe that plaintiff implemented the things that she recommended in the document. (*Id.* 35-41) As to the remaining emails with attachments, containing "side by side comparisons," defendant testified that she got the information contained in the documents online. (*Id.* 45-64) Defendant also testified that it would have taken her "seconds" to find the information online, and creating the documents would not have taken "long at all." (*Id.* 48-49) Concerning the USB drives, defendant testified that during her employment she was required to download plaintiff's online content onto the drives to give to contractors. Defendant never took a USB drive home. (*Id.* 67-68)

Defendant further argues that the information contained in the emailed documents does not contain independent economic value. Defendant asserts that plaintiff only submits Mazzella's declaration wherein he states, in a conclusory manner, that the information defendant had access to "derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by persons unaffiliated with Sheffield Metals." (Mazzella decl. ¶ 4) But, Mazzella did not specifically address the independent economic value of the information contained in the eight emails with attachments. (*Id.* ¶ 10) Defendant contends that even if the information in the emails had economic value in 2015 when they were sent, there is no evidence that they continued to have independent economic value based on confidentiality in 2017. Nor, defendant claims, did Mazzella state that the side-by-side comparisons were confidential and, thus, they had no value at all.

Defendant also maintains that plaintiff failed to take reasonable steps to protect the purported trade secrets given that the NDNC Agreement did not prohibit employees from using their personal email and computers for work functions. Given that defendant testified that she sent the emails to her home account because she did not have enough time at work and plaintiff did not issue her a laptop, defendant asserts that plaintiff cannot claim it was unaware that its employees sent emails between their work and personal accounts. Additionally, defendant shows that she sent at least one email from her personal account to another Sheffield employee at a company email address regarding a business matter. (Doc. 47 Ex. J) Defendant also maintains that she testified that she "pulled all of Sheffield's product information off of Sheffield's publicly-available website" (Doc. 53 at 7), but the deposition testimony that she points to merely states that she got the information "online." (deft. depo. II 48-49)

Finally, defendant argues that plaintiff has not shown that she misappropriated the purported trade secrets. As stated above, plaintiff must establish that defendant acquired the trade secret and used it without authorization. *AK Steel Corp. v. Pittsburgh Logistics Systems, Inc.,* 2017 WL 194349 (S.D.Ohio January 18, 2017 (citations omitted). Defendant asserts that there is no evidence that she actually used the purported trade secrets after her employment with plaintiff ended or that she disclosed any trade secret to anyone outside of Sheffield. Nor, defendant asserts, is there any evidence that she retained any of the trade secret information. In fact, she testified at deposition that, upon searching, she determined that she did not retain any of the 2015 or 2016 emails in her personal email account. Finally, she testified that she sent the emails to her personal account so that she could work from home, an act that was not prohibited by the NDNC Agreement.

14

For the following reasons, the Court finds that there is no genuine issue of fact as to this claim and, therefore, plaintiff's motion is denied and defendant's motion is granted.

Initially, the Court is not satisfied that plaintiff has demonstrated the existence of a trade secret. Plaintiff maintains that it has established that the attachments to the emails (documents created by defendant from information she found online) did contain confidential and trade secret information.   But, plaintiff points to Mazzella's declaration which only states:

> The attachments to Exhibit 13 and 14 reflect marketing and strategic planning information. Kevwitch sent some of this information to her personal email address after work on the matter was complete.  Similarly, the attachments to Exhibit 15-20 are side-by-side comparisons.  These reflect research that Sheffield Metals conducted and also reflect a comparison of Sheffield Metals products to the products of its competitors. These documents were from work completed over a year before when she sent them to her personal email address.  Exhibit 15 is a product comparison sheet which compares a Sheffield Metals product to a Drexel Metals product.

(Mazzella decl. ¶ 10).  This statement is insufficient to establish that the attachments contained trade secret information.

Even assuming that Mazzella's declaration is sufficient to show that the attachments contained trade secrets, plaintiff does not proffer sufficient evidence to show that defendant misappropriated the trade secrets.  Defendant maintains that there is no evidence that defendant actually used the trade secrets after her employment with plaintiff ended, or disclosed them to anyone outside plaintiff. The emails were sent between March 23, 2015 and April 22, 2016. Defendant was terminated in September 2016.  Defendant testified at deposition that she searched her personal email for these emails and did not locate them.  In response to defendant's arguments, plaintiff repeatedly relies on the facts that defendant 1) sent the work emails to her personal email account, 2) attachments to the emails contained confidential and trade secret information, and 3) when asked to return or destroy any confidential information, defendant

15

failed to respond. There simply is insufficient evidence to establish an issue of fact as to misappropriation.

Plaintiff's motion as to this claim is denied and defendant's motion is granted.

**2. Breach of Contract (Count Two)**

To allege a breach of contract claim under Ohio law, a plaintiff "must establish: (1) the existence of a binding contract; (2) plaintiff's performance; (3) defendant's breach; and (4) damages or loss as a result of such breach." *PolyOne Corp. v. Barnett,* 2011 WL 1540391 (N.D.Ohio April 11, 2011)) (citing *MP Totalcare Serv., Inc. v. Mattimoe*, 648 F.Supp.2d 956, 962 (N.D.Ohio 2009)) (other citations omitted). "If a breach of contract involves a restrictive covenant, such as a contract not-to-compete agreement, the employer must also establish the contract's validity." *Id.* (citing *Raimonde v. Van Vlerah*, 42 Ohio App.3d 308, 314 (1975)). "Agreements restricting a former employee from competing with a former employer will be enforced, however, if the former employer can show that (1) enforcement is required to protect its legitimate business interests, (2) the restriction does not impose an undue hardship on the employee, and (3) the restriction is not injurious to the public." *Id.* (citations omitted). Ohio courts consider the following factors in determining whether the restrictions are reasonable:

> [t]he absence or presence of limitations as to time and space; whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*AL Steel Corp. v. ArcelorMittal USA, LLC,* 55 N.E.2d 1152 (Ohio App. 12th Dist. 2016) (quoting

*Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 25 (1975)).

In its motion, defendant only argues that the breach of contract claim fails because plaintiff cannot show that it suffered damages or loss. Defendant asserts that there is no evidence that plaintiff lost any business to Drexel as a result of defendant's employment at Drexel and her communications with Drexel customers. Defendant testified that, while at Drexel, she did not obtain any business or receive new commissions as a result of her communications with Sheffield customers. (deft. depo. II 89-98) Nor, defendant asserts, has plaintiff shown that defendant caused any of plaintiff's customers to transfer their business from plaintiff to Drexel. Plaintiff maintains that the NDNC Agreement contains a clause which allows for reasonable attorneys' fees incurred in connection with enforcing the agreement, as well as injunctive relief.

Summary judgment to defendant is inappropriate on the issue of damages alone. The NDNC Agreement provides that remedies for a breach include "specific enforcement" and injunctive relief, as well as "reasonable expenses, fees, and costs incurred in connection with a proceeding to enforce this Agreement, including reasonable attorneys' fees and related costs and expenses." (Ex. 10 ¶ 7) Therefore, damages are not limited to lost business.

Turning to whether plaintiff is entitled to summary judgment on this claim, the Court finds that plaintiff has demonstrated that the NDNC Agreement is reasonable and, therefore, valid and enforceable.[5] The agreement places a one year restriction on post-employment. Such

---

[5] In arguing that the NDNC is unreasonable, defendant relies heavily on *Brentlinger Enters v. Curran,* 752 N.E.2d 994 (2001). However, the Sixth Circuit has cautioned against relying on this case in this manner:

Flerick has advanced a remarkably cramped interpretation of Ohio law. In so doing, he relies primarily on one case, *Brentlinger Enters. v. Curran*, 141 Ohio App.3d 640, 752 N.E.2d 994 (2001), in which the Ohio Court of Appeals upheld

17

a restriction has been found to be reasonable. *Life Line Screening of AM. v. Calger,* 145 Ohio Misc.2d 6 (Cuy. Cty. 2006) (finding a 2-year period reasonable and collecting cases upholding contracts calling for 2-year restrictions and longer). Likewise, the 100 mile restriction is not unreasonable. See *Am. Logistics Group, Inc. v. Weinpert*, 2005 WL 2240987 (Ohio App. 8th Dist. Sept. 15, 2005) (upholding a 75 mile geographic restriction in a covenant not to compete). Plaintiff also points out that the 100 mile radius covers only central Colorado. While plaintiff does not show that defendant was the sole contact with the customer, defendant's deposition testimony and resume show that she had substantial contact with customers in her position with plaintiff. (deft depo. Ex. 11) Courts recognize that an "employer has a legitimate business interest in limiting a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established contact." *FirstEnergy Solutions Corp. v. Flerick,* 521 Fed.Appx. 521 (6th Cir. 2013) (citations omitted). Mazzella's declaration testimony is that defendant possesses confidential and proprietary information. The agreement seeks to eliminate unfair competition, not ordinary competition, given that it prohibits employment in the metal roofing business as restricted in geography and time. Defendant herself states that she worked for Modern Materials during the one year period - an entity that is not in the same industry as plaintiff. (deft. decl.) Nor does the agreement seek

_____

the trial court's ruling that a noncompete clause in a car salesman's employment agreement was unreasonable. We have cautioned against interpreting too broadly a fact-bound case evaluating a noncompete covenant. *See Chicago Title* [*Ins. Corp. v. Magnuson*], 487 F.3d [985] at 993. Even aside from the fact that *Brentlinger* in no way purported to alter the well-established standard for evaluating noncompete clauses, *Brentlinger* merely upheld as a proper exercise of discretion a trial court's decision not to enforce a noncompete covenant, and its holding cannot be extended much farther than its facts. *See Brentlinger*, 752 N.E.2d at 1003–04.

18

to stifle defendant's skills and experience as evidenced by her employment with Modern Materials. The latter also shows that the agreement was not disproportionately in plaintiff's benefit as defendant's base pay at Modern Materials exceeded that at Drexel. (deft. decl.) This also shows that the agreement does not act as a bar to defendant's sole means of support. Finally, the forbidden employment is not incidental but targeted to the specific work defendant performed with plaintiff and the customers she had contact with there.

On the whole, the agreement is reasonable. Even assuming that some of the factors do not strongly support plaintiff's position, the Court is mindful that "no one factor is dispositive of the reasonableness analysis." *FirstEnergy Solutions, supra* (citations omitted). Thus, a "potential deficiency" as to one of the factors is not dispositive of the reasonableness inquiry. *Id.*

The Court also finds that defendant breached the agreement. First, she failed to disclose the agreement to Drexel in violation of ¶ 6(e) of the NDNC Agreement. ("During the first year after my employment with the [plaintiff] ends"... "I agree to give a copy of this Agreement to any potential employer of mine.") Defendant does not dispute this. However, she argues that plaintiff fails to present evidence that it was harmed thereby and the fact that the lawsuit was filed is insufficient since there is no evidence that litigation would not have occurred but for this breach. Nonetheless, defendant breached the provision.

Second, she began working for Drexel in violation of ¶ 6(a). ("During the first year after my employment with the [plaintiff] ends"... " I agree not to directly or indirectly work for... a business, that is engaged to any extent in the business of selling... metal roofs, roof panels and equipment... anywhere within 100 miles of any location at which I worked... for the [plaintiff].") As discussed above, plaintiff presents evidence that Drexel is a competitor to plaintiff which

defendant does not really dispute. Defendant also acknowledged at deposition that once she learned she had the non-compete, she immediately left her work with Drexel so as not to be in further violation of the agreement. Defendant does not dispute that her employment with Drexel was in breach of the agreement, but only that it did not result in harm to plaintiff.

Third, she solicited the business of customers she had communicated with while employed with plaintiff in violation of ¶ 6(b) ("During the first year after my employment with the [plaintiff] ends"... "I agree not to solicit or accept any business from a current or prospective client or vendor of the [plaintiff] ... with whom I had any communication during the 3 years immediately preceding the end of my employment with [plaintiff]. ") Defendant disputes that she breached the non-solicitation provision.  Defendant contends that plaintiff relies only on the double hearsay declarations of LaCrue and Mazella that they learned from plaintiff's customers that defendant had contacted them. However, the email, referenced above, that defendant sent to a representative of District 7 in regards to business is evidence that she solicited business of customers that she had communicated with while working for plaintiff.

Fourth, she disparaged plaintiff and its employees in violation of ¶ 6(d).  ("During the first year after my employment with the [plaintiff] ends"... "I agree not to disparage the [plaintiff] or any of their ... employees.") Defendant does not dispute this.[6]  Although she argues that plaintiff proffers no evidence that it was harmed thereby, it still constitutes a breach.

Finally, plaintiff asserts that defendant kept and did not return plaintiff's information in violation of ¶ 4(g) ("When my employment with [plaintiff] ends, I must return immediately to

---

[6]     Plaintiff submits evidence that defendant made comments online disparaging plaintiff.

[plaintiff] all documents, computer files, and other things that contain any Trade Secrets and cannot keep any copies.") Defendant points to her deposition testimony that upon searching her private email, she could not locate emails that she sent to herself while working with plaintiff and that she never took a USB drive home.  The Court finds that plaintiff has not established that defendant retained documents containing trade secrets.

As plaintiff has demonstrated a valid contract, its breach, and that damages were incurred, plaintiff is entitled to summary judgment.  Notably, the Court finds that plaintiff has only established damages in the form of attorneys' fees, expenses, and costs.  In plaintiff's brief in opposition to defendant's Motion for Summary Judgment and in its briefing on its own motion, plaintiff does not address any damages other than costs in enforcing the contract.

### 3.  Tortious Interference with Contract and Business Relationships (Counterclaim)

Defendant asserts a counterclaim entitled "Tortious Interference with Contract and Business Relationships."  The counterclaim alleges that a valid contract existed between Kevwitch and Drexel.  Plaintiff knew of the contract. Plaintiff, without justification, induced Drexel not to perform the contract.  Defendant suffered damages.

Plaintiff argues that this counterclaim fails because interference with contract claims are not available to at-will employees such as defendant.  Contrary to defendant's arguments, plaintiff is correct that, in Ohio, "tortious interference with contract is not a viable cause of action for at-will employees. " *Hustler Cincinnati, Inc. v. Cambria,* 625 Fed.App.712 (6th Cir 2015) (citing *Mitchell v. Mid-Ohio Ermergency Servs., LLC,* 2004 WL 2803419 (Ohio Ct.App. Sept. 30, 2004)) (other citations omitted).

However, defendant's counterclaim is entitled "tortious interference with contract and

business relationships." As the *Hustler* court recognized, Ohio does recognize the separate tort of tortious interference with business relations. A claimant must establish: "1) a business relationship, 2) the defendant's knowledge of the relationship, 3) intentional interference resulting in a breach or termination of the relationship, and 4) damages. *Id.* (citing *Ginn v. Stonecreek Dental Care,* 30 N.E. 3d 1034 (Ohio Ct.App. 2015)). Nonetheless, in its briefs, defendant asserts that the counterclaim is a tortious interference with *employment relations*, also an independent tort. The elements of such a claim are 1) the existence of an employment relationship between plaintiff and the employer; 2) the defendant was aware of the relationship; 3) the defendant intentionally interfered with the relationship; and 4) the plaintiff was injured as a proximate result of the defendant's acts. *Hetmanski v. Doe,* 2017 WL 3480363 (Ohio App. 11th Dist. August 14, 2017 )(citations omitted). Tortious interference with employment requires evidence of wanton or malicious conduct. *Id.* See also *Mitchell v. Mid-Ohio, supra* (The "tort requires a showing of malicious interference or wanton behavior." )

The Court construes the counterclaim as one for tortious interference with employment relations.[7] However, the Court agrees with plaintiff that there is no evidence of malice. The evidence only shows that plaintiff acted to enforce the NDNC Agreement.

Summary judgment is granted to plaintiff and denied to defendant on the counterclaim.

**Conclusion**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted as to

---

[7] Because the Court will assume that the counterclaim pleads tortious interference with employment relations, the Court need not address defendant's request in its reply in support of its Motion for Summary Judgment that the Court amend the pleadings to more accurately plead a claim for tortious interference with employment relationship. (Doc. 60 at 13)

Counts One and Four (misappropriation of trade secrets) and denied as to the remaining grounds. Plaintiff's Motion for Summary Judgment is granted as to Count Two (breach of contract) and the counterclaim, and denied as to Counts One and Four.

The Court finds that the non-compete agreement has been satisfied. This lawsuit involved defendant's employment with Drexel. Using plaintiff's calculations as to injunctive relief (Doc. 61 at 9), the 95 days defendant was employed by Drexel extended the agreement to January 12, 2018. Thus, no injunctive relief is left on the breach of contract claim. Plaintiff must submit evidence supporting its reasonable attorneys' fees, expenses, and costs. Plaintiff's brief is due 14 days from the date of this Memorandum of Opinion and Order and defendant's brief is due 14 days thereafter. Plaintiff's reply is due 7 days after the filing of defendant's brief.

The Court will now turn to the court-ordered TRO and the issue of whether defendant should be found to be in contempt for violating it. The Court will likewise consider this issue on briefs. The same briefing schedule outlined above applies.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Court
Chief Judge

Dated: 3/13/18